# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| |
|---|
| LISA WHITE, |
|     Plaintiff, |
|         v. |
| FOUR SEASONS HOTELS AND RESORTS, |
|     Defendant. |

Civil Action No. 13-1399 (JEB)

## MEMORANDUM OPINION

Plaintiff Lisa White is a black woman who works as an esthetician at the Four Seasons Hotel here in Washington. Alleging retaliation, discrimination on the basis of her race and pregnancy status, and a hostile work environment, White brought this suit under the District of Columbia Human Rights Act, D.C. Code § 2-1401.01 *et seq.*, Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*, and the Civil Rights Act of 1866, 42 U.S.C. § 1981. Having removed her action from the District of Columbia Superior Court to this Court, Defendant Four Seasons now moves to compel arbitration pursuant to the terms of the hiring agreement Plaintiff signed in September 2007 and again in February 2009. White does not dispute the existence of an arbitration provision, but argues both that she was improperly pressured to sign the agreement and that the provision is patently unfair; as a result, she contends the Court should not enforce it. Disagreeing with her arguments as to both procedural and substantive unconscionability, the Court will grant the Motion to Compel Arbitration and stay the case pending completion of those proceedings.

## I. Background

Given the involved factual history of this case, an overview of events will be useful in understanding how the parties arrived at the present dispute. In its explication, the Court recounts the facts in the light most favorable to Plaintiff, as is required in a Motion to Compel Arbitration. See Aliron Intern., Inc. v. Cherokee Nation Indus., Inc., 531 F.3d 863, 865 (D.C. Cir. 2008).

In September of 2007, White was hired by the Four Seasons as an esthetician at its Spa here in the District of Columbia. See Compl., ¶ 1. During the hiring process, White was given a presentation on, and encouraged to sign, the Four Seasons' employee contract, known as "EmPact." See Mot., Declaration of Stacey Coppel, ¶ 6. The contract is a document of over 60 pages, including a section referred to as "C.A.R.E.," which stands for Complaint, Arbitration & Review for Employees. See Coppel Decl., Exh. A (C.A.R.E. Agreement).

The C.A.R.E. agreement lists five steps that an employee agrees to follow prior to the sixth step of "Mediation/Arbitration": 1) an informal discussion with the immediate supervisor; 2) the filing of a "written complaint with the Human Resources office within 14 days" of an incident; 3 & 4) a formal investigation and written report by the Director of Human Resources; and 5) an appeal to the General Manager if the employee is not satisfied. Id. This C.A.R.E. agreement, unlike most employee contracts containing arbitration provisions, also provides an opt-out clause, allowing the employee to opt out of the mediation/arbitration step within 30 days of being presented with the agreement or after having "successfully completed" a 90-day probationary period. See Coppel Decl., Exh. B (Opt-Out Verification). This arbitration agreement does not permit the employee to opt out while any legal claim that arose prior to signing the opt-out form is pending. See id.

On the signature page of the EmPact agreement are the employee's and the employer's basic promises, outlined in bulleted plain English. See Coppel Decl., Exh. C (EmPact Signature Page). The employee's promises include a commitment to "Use C.A.R.E. first for all complaints even if [the employee has] exercised [her] right to opt out of the mediation/arbitration provision of C.A.R.E." and to "use the mediation/arbitration procedure" in C.A.R.E. to resolve any termination, discrimination, or harassment disputes unless the employee has exercised the right to opt out. Id.

White avers that, although the Four Seasons conducted a 30-minute presentation covering the EmPact, it hid the existence of the agreement's arbitration provisions and the ability to opt out of those provisions. See Opp., Declaration of Lisa White, ¶ 5. According to White, upon the conclusion of this presentation, Defendant requested that she and her colleagues "immediately sign the EmPact agreement" without giving employees the opportunity to read the agreement or consult with a third party regarding its contents. Id. White signed the agreement, purportedly without realizing the commitment she was making. See id.

In February 2009, White was approached by Assistant Supervisor Steve Ellis, who directed her to again sign the signature page of the EmPact agreement, which he stated was "for [her] benefit" because " it would help to secure [her] employment with Four Seasons." Id., ¶ 6. White states that the EmPact agreement and its arbitration provisions were not included with the document that was presented to her, and that Ellis never informed her of her ability to opt out of the arbitration agreement. See id. White nevertheless again signed this signature page. See Coppel Decl., Exh. D (2009 EmPact Signature Page).

White's employment with the Four Seasons, meanwhile, was hardly proceeding smoothly. In 2008 and continuing through to the filing of this action, she made nearly 30 formal

and informal complaints to her supervisors, managers, and Director of Human Resources Stacey Coppel concerning various incidents that she perceived to be harassment, discrimination, or the creation of a hostile work environment. See generally Compl.; see Mot. at 6. These complaints ranged from disputes over client-booking and sales-crediting practices to sabotage by co-workers, and she sometimes made specific reference to the EmPact guide. See Coppel Decl. at 6-11; Coppel Decl., Exh. J (May 10, 2010 Complaint) at 1, 6 ("I felt retaliated against for merely exercising my rights as it is outlined in our Employee Empact Guide," and "It is clearly outlined in the Employee Empact on page 33 that, 'the Four Seasons . . . strongly believes in a [*sic*] open door communication . . . .[']"). The reply to these allegations by Defendant, in at least one instance, also made mention of the C.A.R.E. process. See Coppel Decl., Exh. K (May 25, 2010, Reply) at 1 ("I am writing to provide you with the findings of my investigation based on your CARE complaint.").

White eventually signed the opt-out agreement on August 7, 2012. See Coppel Decl., ¶ 13; White Decl., ¶ 9. This is relevant because one further incident occurred five days later on August 12, during which White claims to have been "interrogated" by two managers regarding a complaint against her from a fellow employee. No disciplinary action was ultimately taken against White with regard to this incident. See Compl., ¶ 51; Reply, Supplemental Declaration of Stacey Coppel, ¶ 10. Finally, in January of 2013, the parties attempted to mediate all claims occurring prior to her August 7, 2012, opt-out under the C.A.R.E. provisions for mediation. See Mot. at 12. That mediation was unsuccessful. See id.. White then filed this suit, and Defendant now moves to compel arbitration.

## II. Legal Standard

The Federal Arbitration Act "is a congressional declaration of a liberal federal policy favoring arbitration agreements." Moses H. Cone Memorial Hosp. v. Mercury Const. Corp., 460 U.S. 1, 24 (1983) (referencing 9 U.S.C. § 2). Suits brought "upon any issue referable to arbitration under an agreement in writing for such arbitration" must be stayed "until such arbitration has been had . . . , providing the applicant for the stay is not in default in proceeding with such arbitration" and that the court has been "satisfied that the issue involved in such suit or proceeding is referable to arbitration under such an agreement." 9 U.S.C. § 3.

When considering a motion to compel arbitration, "the appropriate standard of review for the district court is the same standard used in resolving summary judgment motions pursuant to Fed. R. Civ. P. 56(c)." Brown v. Dorsey & Whitney, LLP, 267 F. Supp. 2d 61, 67 (D.D.C. 2003) (internal quotation marks and citation omitted); see Hughes v. CACI, Inc., 384 F. Supp. 2d 89, 92-93 (D.D.C. 2005). "As the party seeking to compel arbitration, Defendant[] must first come forward with evidence sufficient to demonstrate an enforceable agreement to arbitrate." Hill v. Wackenhut Services Int'l, 865 F. Supp. 2d 84, 89 (D.D.C. 2012) (citation omitted). The burden then shifts to Plaintiff "to raise a genuine issue of material fact as to the making of the agreement, using evidence comparable to that identified in Fed. R. Civ. P. 56." Grosvenor v. Qwest Communications Intern., Inc., 2010 WL 3906253, at *5 (D. Colo. 2010). Arbitration should be compelled if "there is 'no genuine issue of fact concerning the formation of the agreement' to arbitrate.'" Kirleis v. Dicki, McCamey & Chilcote, PC, 560 F.3d 156, 159 (3d Cir. 2009) (quoting Par-Knit Mills, Inc. v. Stockbridge Fabrics Co., 636 F.2d 51, 54 (3d Cir. 1980)).

To review the Rule 56 standard, a fact is "material" if it is capable of affecting the substantive outcome of the litigation. Holcomb v. Powell, 433 F.3d 889, 895 (D.C. Cir. 2006); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A dispute is "genuine" if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. See Scott v. Harris, 550 U.S. 372, 380 (2007); Liberty Lobby, 477 U.S. at 248; Holcomb, 433 F.3d at 895. "A party asserting that a fact cannot be or is genuinely disputed must support the assertion by citing to particular parts of materials in the record." Fed. R. Civ. P. 56(c)(1)(A).

The party seeking summary judgment "bears the heavy burden of establishing that the merits of his case are so clear that expedited action is justified." Taxpayers Watchdog, Inc., v. Stanley, 819 F.2d 294, 297 (D.C. Cir. 1987). When a motion for summary judgment is under consideration, "the evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." Liberty Lobby, 477 U.S. at 255; see also Mastro v. PEPCO, 447 F.3d 843, 850 (D.C. Cir. 2006); Aka v. Washington Hosp. Ctr., 156 F.3d 1284, 1288 (D.C. Cir. 1998) (*en banc*). On a motion for summary judgment, the Court must "eschew making credibility determinations or weighing the evidence." Czekalski v. Peters, 475 F.3d 360, 363 (D.C. Cir. 2007).

The nonmoving party's opposition, however, must consist of more than mere unsupported allegations or denials and must be supported by affidavits, declarations, or other competent evidence, setting forth specific facts showing that there is a genuine issue for trial. Fed. R. Civ. P. 56(e); Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986). The nonmovant is required to provide evidence that would permit a reasonable jury to find in its favor. Laningham v. United States Navy, 813 F.2d 1236, 1242 (D.C. Cir. 1987). If the nonmovant's evidence is

"merely colorable" or "not significantly probative," summary judgment may be granted. Liberty Lobby, Inc., 477 U.S. at 249-50.

**III.     Analysis**

There is no dispute here as to the existence of the EmPact's arbitration provision. Instead, White argues that the Court should not enforce the provision because of both procedural and substantive unconscionability. After ultimately rejecting these contentions, the Court must also determine whether to stay or dismiss the case pending arbitration.

A. Procedural Unconscionability

White first asserts that she was forced to sign the EmPact agreement without a sufficient opportunity to understand or appreciate the commitment she was making. Whether or not an arbitration agreement is procedurally unconscionable turns on whether a party "lacked meaningful choice as to whether to enter the agreement." Fox v. Computer World Services Corp., 920 F. Supp. 2d 90, 97 (D.D.C. 2013). This is determined under the totality of the circumstances – that is, the Court must ask whether each party to the contract, "considering his obvious education or lack of it, ha[d] a reasonable opportunity to understand the terms of the contract, or [whether] the important terms [were] hidden in a maze of fine print and minimized by deceptive [] practices." Williams v. Walker-Thomas Furniture Co., 350 F.2d 445, 449 (D.C. Cir. 1965).

White begins by maintaining that her lack of legal knowledge renders the arbitration provision unenforceable. See Opp. at 12-13 (citing Walker-Thomas, 350 F.2d at 449, for proposition that party of little bargaining power, signing a commercially unreasonable contract with "little or no knowledge of its terms," has not truly given consent). Plaintiff states that she has not taken any courses in "business, contracts or the law" and has no experience in these

7

areas. White Decl., ¶ 2. Defendant counters that White is a native English speaker, graduated from high school, and took two years of post-high school education in General Studies and Fine Arts. See Reply at 4; White Decl., ¶ 2.

While White may not be a lawyer, her education level gives her an understanding of the plain English language used in the C.A.R.E. agreement, which notably includes a section titled "what is mediation/arbitration" and attempts to define certain potentially confusing terms such as "no-fault separation pay." C.A.R.E. Agreement at 60-62. The signature page also plainly states that "Unless I have exercised my right to opt-out," the employee agrees to "use the mediation/arbitration procedure described in C.A.R.E" as the only method to resolve disputes "relating to termination" and/or "claims of employment discrimination, [or] harassment." EmPact Signature Page. The arbitration agreement therefore does not contain the hidden pitfalls or extensive legal jargon imagined by Walker-Thomas. See 350 F.2d at 449. As a result, this lack-of-legal-knowledge argument does not aid White. See Shelton v. The Ritz Carlton Hotel Co., 550 F. Supp. 2d 74, 80 (D.D.C. 2008) (rejecting argument that woman with junior-high education lacked background to understand similar contract containing arbitration provisions where there was no fraud, duress, or mutual mistake).

Moving next to the circumstances of White's signing, the Court notes that "one who signs a contract has a duty to read it and is obligated according to its terms," Skrynnikov v. Fed. Nat. Motg. Ass'n, No. 11-0609, 2013 WL 1901037, at *4 (D.D.C. May 8, 2013), and one who signs a contract is bound by its terms "unless . . . she can show special circumstances relieving . . . her of such an obligation." Hughs v. CACI, Inc.-Commercial, 384 F. Supp. 2d 89, 96 (D.D.C. 2005). The parties here dispute how much time was allotted for White to read through the EmPact agreement. Defendant claims that standard practice is to dedicate one hour to describing

8

the EmPact, with 15 to 20 minutes spent particularly describing the C.A.R.E process. See
Coppel Supp. Decl., ¶ 3. Plaintiff recalls only a generalized 30-minute presentation without
mention of the arbitration provisions. See White Decl., ¶ 5. Given the posture of the case, the
Court must assume that Plaintiff is correct in her assertion that she was given only a 30-minute
overview of the over 60-page document, without the opportunity to ask for third-party advice or
to review the agreement any further. See id.

Yet, even under that assumption, the documents themselves belie White's claims of lack
of comprehension. First, she initialed an orientation checklist next to the words "grievance
procedure," which, according to Coppel, is the indication for a "brief description of the C.A.R.E.
process." Coppel Supp. Decl., Exh. 3 (Orientation Checklist) at 5; Coppel Supp. Decl., ¶ 6.
White herself thus indicates that she was at least made aware of the C.A.R.E. provisions of the
EmPact. In other words, the C.A.R.E. provisions were hardly facts "known or accessible only to
defendant." Toledano v. O'Connor, 501 F. Supp. 2d 127, 145 (D.D.C. 2007) (internal quotation
marks omitted) (applying California law). White also does not dispute that, in conversations
with the Four Seasons' HR Director, she "routinely refer[red] to the steps of C.A.R.E." and
"seemed intimately familiar with the C.A.R.E. process," Coppel Supp. Decl., ¶ 8, which also
calls into question her claim of lack of comprehension.

Even more compelling is the C.A.R.E. signature page. This page alludes to C.A.R.E.
seven times and to arbitration no fewer than three times, expressly mentioning the employee's
promise to "use the mediation/arbitration procedure described in C.A.R.E. as the exclusive
method of resolving any dispute . . . relating to . . . claims of employment discrimination, [or]
harassment." EmPact Signature Page at 1. The language and the structure of this page make it
difficult to see how White could conceivably claim that she was not put on notice of the

9

existence of an arbitration agreement. In particular, the top portion of the page states, "I have read EmPact and promise to:" followed by a series of four bullet points, among which are two that promise to "[u]se C.A.R.E. first for all complaints <u>even if I have exercised my right to opt out of the mediation/arbitration provisions of C.A.R.E.</u>" and "<u>[u]nless I have exercised my right to opt out, use the mediation/arbitration procedure described in C.A.R.E.</u> as the exclusive method of resolving any dispute I may have . . . ." <u>Id.</u> (emphasis added). The use of bullet points and short, clear phrases makes it even easier for the reader to understand the terms written on the single signature page. White wrote her name twice on different portions of this one-page signature form and signed the bottom portion. "One who signs a contract which he had an opportunity to read and understand is bound by its provisions." <u>Paterson v. Reves</u>, 304 F.2d 950, 951 (D.C. Cir. 1962) (*per curiam*). The Court therefore finds that there can be no dispute that White was made aware of and agreed to the plain terms of the agreement to arbitrate.

White additionally claims not to have understood the implications of having signed her EmPact agreement. <u>See</u> Opp. at 3. But this is not relevant because it was her responsibility to "think the matter through" before signing the contract. <u>See</u> <u>Nur v. KFC, USA, Inc., 142 F. Supp. 2d 48,</u> 51 (D.D.C. 2001) (internal quotation marks omitted). If she understood what C.A.R.E. concerned – as the Court has found – "[t]hat [she] may not have comprehended the implications of [her] decision is irrelevant as to whether the agreement is valid." <u>Id.</u> This argument therefore gains no traction here.

Plaintiff also contends that the placement of the arbitration provisions in the EmPact amounted to hiding them in a maze of fine print, unidentifiable to the normal observer. <u>See</u> Opp. at 15. She argues that the terms were "hidden" in the final pages of the document, without any "differentiating font or heading to draw a reasonable reader's attention to it," and she takes issue

with the fact that the arbitration provisions are not entitled "Arbitration Agreement." Id. at 12, 15. Defendant correctly responds that the arbitration portion is "set out separately at the end of the booklet." Reply at 2; see EmPact Agreement. This portion of the agreement, moreover, is actually titled "Complaint, Arbitration & Review for Employees," a term that indicates that the document pertains to arbitration. See C.A.R.E. Agreement at 1 (emphasis added). The signature page, as described above, also clearly alludes to the C.A.R.E. agreement and states that the employee agrees to mediate/arbitrate unless she has opted out. See EmPact Signature Page at 1. Even taking the facts in the light most favorable to the non-movant, the Court concludes that the arbitration terms were not hidden in a maze of fine print and that Defendant did not use deceptive practices.

Plaintiff last adverts to her "distinct disparity in bargaining power" with Defendant, a corporate employer. See Opp. at 13. Defendant, however, made an attempt to minimize this advantage by providing an opt-out provision within the arbitration agreement. White had 30 additional days from the date of signing the EmPact agreement to exercise her opt-out rights. See Coppel Decl., Exh. F (Opt-Out Verificaton). By including this opt-out clause, and by giving Plaintiff a month to consider the C.A.R.E. arrangement, Defendant appears to have made a good-faith effort to level the playing field, further casting doubt on Plaintiff's assertion that it was attempting to "impose[] the arbitration provisions" on her. Opp. at 13; see Circuit City Stores, Inc. v. Ahmed, 283 F.3d 1198, 1199-1200 (9th Cir. 2002) (finding no contract of adhesion or procedural unconscionability where employer provided 30-day opt-out option from arbitration program). Indeed, one other court has already addressed – and rejected – this very same argument from a plaintiff who attempted to avoid the EmPact agreement's mandatory arbitration provisions. See Rodriguez v. Four Seasons Hotels, Ltd., No. 902864, 2009 WL 2001328, at *4

(S.D.N.Y. July 10, 2009) (rejecting plaintiff's claim of unequal bargaining power and forcing plaintiff into arbitration because, *inter alia*, plaintiff "was not required to submit to the offending mediation/arbitration provisions as a condition of employment, but was provided with the choice of opting out").

In sum, because Plaintiff is a sufficiently educated, English-speaking adult who was given the right to opt out of an arbitration provision that was clear and emphasized on the signature page of the contract, the Court finds as a matter of law that no procedural unconscionability occurred here.

B. Substantive Unconscionability

Plaintiff next assertss that the arbitration agreement was substantively unconscionable. "A contract is substantively unconscionable if the contract terms are unreasonably favorable to one party" such that they are "so outrageously unfair as to shock the judicial conscience." Fox, 920 F. Supp. 2d at 99 (internal quotation marks and citation omitted).

White argues that the requirement that she first speak with her tormentor via an informal discussion with an immediate supervisor renders the arbitration agreement exceedingly unfair. See Opp. at 17-19 (citing, *inter alia*, EEOC v. V & J Foods, Inc., 507 F.3d 575, 579 (7th Cir. 2007) ("A policy against harassment that includes no assurance that a harassing supervisor can be bypassed in the complaint process is unreasonable as a matter of law.")). In the cases Plaintiff cites, however, there was no further recourse once the alleged victim had reported to her immediate supervisor. In contrast, the C.A.R.E. agreement provides such recourse. "If step 1 does not solve the problem," a written complaint may be filed with the Human Resources Office, thereby circumventing control of information by the alleged perpetrator. See C.A.R.E. Agreement. Having this secondary step avoids the perceived danger of chilling victims who may

12

observe that reports of harassment to the harasser-supervisor result in no action. See EEOC v. Mitsubishi Motor Mfg. of America, Inc., 990 F. Supp. 1059, 1080 n.16 (C.D. Ill. 1998).

White also takes issue with what she perceives as a heightened notice requirement owed to Defendant because under C.A.R.E., before receiving the benefit of arbitration, she must first to follow a five-step procedure, including an informal and formal complaint process. See Opp. at 19; C.A.R.E. Agreement at 1. Yet the case that White cites to support that argument, Lake v. AK Steel Corp., No. 3-517, 2006 WL 1158610 (W.D. Pa. May 1, 2006), does not do so. While the case does allude to not placing an "increased burden on a complainant to prove notice beyond that required by law," this concerned the fact that an employer, once on notice, has a duty to eliminate all harassment towards the complainant if that notice pointed to systematic harassment. Id. at *48. In fact, Lake goes on to voice support of policies that "permit both informal and formal complaints of harassment [to] be made." Id. The requirement under C.A.R.E. for Plaintiff to informally and formally complain prior to arbitration is thus not in tension with Lake, a non-binding case from the Western District of Pennsylvania.

Plaintiff next claims that C.A.R.E.'s requirement that complaints be filed within 14 days of the incident is unconscionable, and she cites multiple cases from other jurisdictions for that proposition. See Opp. at 20 (citing Alexander v. Anthony Int'l, LP, 341 F.3d 256, 266-67 (3d Cir. 2003) (30-day filing requirement unreasonable and unconscionable in discrimination case); Graham Oil Co. v. ARCO Prods. Co., 43 F.3d 1244 (9th Cir. 1994) (clause reducing one-year limitations period to 90 days or six months interfered with statutory policy). The Court, however, finds more persuasive the treatment of the issue in Fox v. Computer World Services Corp., 920 F. Supp. 2d 90 (D.D.C. 2013). There, a court in this district found that "[t]he 'party resisting arbitration on the ground that the terms of an arbitration agreement interfere with the

13

effective vindication of statutory rights bears the burden of showing the likelihood of such interference.'" Id. at 100 (quoting Booker v. Robert Half Intern., Inc., 413 F.3d 77, 81 (D.C. Cir. 2005)). There, as here, since the plaintiff submitted the claims at issue well within the arbitration agreement's time limit and was not barred from action on the basis of the agreement, the court found the agreement enforceable. Id. Because Plaintiff has not shown any likelihood of interference with her statutory rights regarding filing periods for the claims at issue, the Court will not void the arbitration agreement on this ground.

Pointing out that Defendant is not similarly bound by the arbitration provision, and that it may "prosecute employment-related claims in court and there are no restrictions on its ability to do so," Plaintiff next asserts that the agreement is unconscionably one-sided. See Opp. at 20. There are two problems with such an argument. First, the EmPact agreement equally binds the Four Seasons to use C.A.R.E. (and impliedly its arbitration provisions) as the "exclusive remedy for resolving any disputes relating to [Plaintiff's] . . . claims of employment discrimination, [or] harassment." EmPact Signature Page at 1 (emphasis added). Second, the reason that the C.A.R.E. provisions focus on the claims of White, rather than the hotel, is that a claim of discrimination or harassment "belongs to the employee, not to the employer." See Shelton, 550 F. Supp. 2d at 81 n.4 (upholding arbitration requirement binding only employee to arbitration regarding discriminatory or retaliatory management). Plaintiff, in fact, cannot point to any type of claim that her employer could feasibly bring in court against her that would not otherwise be arbitrable under the C.A.R.E. agreement. The arbitration provision is therefore not unconscionably one-sided.

Given that the Court finds that the agreement is not substantively unconscionable, it need not consider Defendant's alternative argument that Plaintiff's previous invocation of the C.A.R.E. procedures estops her from contesting their validity now.

C. Stay or Dismiss

One issue remains: the Court must decide whether to stay the case pending arbitration or to dismiss it. While Defendant requests dismissal upon a finding that all claims are to be referred to arbitration, neither the D.C. arbitration statute nor the Federal Arbitration Act contemplates this type of relief. These statutes direct the Court to stay proceedings "upon being satisfied that the issue involved in such suit or proceeding is referable to arbitration under such an agreement." 9 U.S.C. § 3; see also D.C. Code § 16-4407(f) ("If the court orders arbitration, the court, on just terms, shall stay any judicial proceeding that involves a claim subject to the arbitration."). In accordance with the D.C. Code and the Federal Arbitration Act, therefore, the Court shall stay, not dismiss, proceedings on any claim found to be within the arbitration provision and referable to arbitration.

Plaintiff also argues that one of her claims is not subject to arbitration because it took place after her signing of the opt-out provision on August 7, 2012. White's Complaint and Opposition characterize the event of August 12 as an "interrogation" that led to severe emotional distress culminating in the termination of her pregnancy. See Opp. at 22-23; Compl., ¶¶ 51-54. Defendant counters that this is a grave exaggeration of what, in actuality, amounted to her supervisors' performing a routine investigation regarding White's interactions with another employee who had complained about White's behavior, and that no disciplinary action was taken against Plaintiff. See Coppel Supp. Decl., ¶ 10.

15

As a preliminary matter, there is no record support for this incident. Even if there were – and to the extent Plaintiff wishes to proceed on this one event in this Court – she cannot do so. This is because the August 12 incident is insufficient to form the basis of a claim for hostile work environment or for retaliation or discrimination.

As to hostile work environment, this single minor occurrence cannot suffice. See Rodriguez v. Donovan, 922 F. Supp. 2d 11, 18 (D.D.C. 2013) (holding that single incident of verbal abuse does not constitute hostile work environment). To prevail on such a claim, Plaintiff would have to show that she had been subjected to Defendant's "discriminatory intimidation, ridicule, and insult" that was "sufficiently severe or pervasive to alter the conditions of [Plaintiff's] employment and create an abusive working environment." Baloch v. Kempthorne, 550 F.3d 1191, 1201 (D.C. Cir. 2008); Hussain v. Nicholson, 435 F.3d 359, 366 (D.C. Cir. 2006). By Plaintiff's own account, what occurred on August 12, 2012, failed to meet this standard. Even if the manner in which Defendant may have questioned White was "hardly ideal," no jury could find the episode "abusive." Hussain, 435 F.3d at 366. Standing alone, the August 12 incident in no way approaches the threshold requirements of a claim for a hostile work environment.

Nor could this event constitute an act of retaliation or discrimination. "Retaliation claims . . . require less [than discrimination claims], barring any act that 'a reasonable employee would have found . . . materially adverse, which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination.'" Joyce v. Office of Architect of Capitol, No. 12-1837, 2013 WL 4758186, at *6 (D.D.C. Sept. 5, 2013) (citing Burlington Indus., Inc. v. Ellerth, 524 U.S. 742, 761 (1998)). In examing what suffices in this area, "[t]he Supreme Court [] has emphasized that sporadic verbal altercations or disagreements

do not qualify as adverse actions for purposes of retaliation claims." Baloch, 550 F.3d at 1199 (citing Burlington N. & Santa Fe Ry. Co. v. White, 548 U.S. 53, 68 (2006)); see also Kline v. Springer, 602 F. Supp. 2d 234, 242 (D.D.C. 2009), aff'd sub nom. Kline v. Berry, 404 F. App'x 505 (D.C. Cir. 2010) (holding incident in which plaintiff was told dentist appointment could not count as lunch break did not have the "requisite level of regularity or severity to constitute material adversity" for any Title VII claim). The questioning that occurred on August 12 may have been distressful to White's sensibilities, but Plaintiff simply has not enumerated any facts suggesting that the event was more than a routine response to an employee's complaint, which did not result in any form of punishment. These actions therefore did not arise to the level of material adversity that could have dissuaded a reasonable worker from making a charge of discrimination. And given that White would fail to clear the lower bar of retaliation, she would certainly fail to establish a claim for discrimination surrounding the events of August 12, 2012.

Even if this Court were somehow to consider the interrogation itself to be sufficiently adverse under the retaliation standard, Plaintiff has failed to show that Defendant's "stated reason for the employment action was not the actual reason," and that it was instead retaliation or based on "race, color, religion, sex, or national origin." Brady v. Office of Sergeant at Arms, 520 F.3d 490, 495 (D.C. Cir. 2008). White has made no such allegation as to this particular incident; on the contrary, it appears that the investigation and questioning carried out by Director of Human Resources Stacey Coppel followed the very procedures at issue in this Opinion – namely, the C.A.R.E. protocol step 3, which states that "the Director of Human Resources will conduct an investigation" concerning a written complaint. See C.A.R.E. Agreement; Coppel Supp. Decl., ¶ 10.

Given that this one event cannot stand alone, the Court will not entertain it during the transfer of the remainder of the case to arbitration.

**IV.     Conclusion**

Because the agreement to arbitrate was not formed under procedurally unconscionable terms and contained no substantively unconscionable language, it is enforceable, and the Court must therefore refer the issues presented to the proper arbitration forum. The Court will stay all claims pending the outcome of such arbitration. A contemporaneous Order so ruling will issue this day.

/s/ James E. Boasberg
JAMES E. BOASBERG
United States District Judge

Date: November 26, 2013