**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| LISA WHITE, <br><br> Plaintiff, <br><br> v. <br><br> FOUR SEASONS HOTEL AND RESORTS, <br><br> Defendant. | Civil Action No. 13-1399 (JEB) |

**MEMORANDUM OPINION**

Plaintiff Lisa White is an esthetician who believes that her former employer, Defendant

Four Seasons Hotel and Resorts, discriminated against her on the basis of her race and

pregnancy.  After White filed suit and Four Seasons successfully moved to compel arbitration, an

Arbitrator selected by the parties held an eleven-day hearing and decided in favor of Defendant.

White now moves to vacate the arbitration award pursuant to the Federal Arbitration Act, 9

U.S.C. § 10(a)(3), arguing that the Arbitrator improperly allowed Four Seasons both to withhold

relevant information and to provide incomplete and inaccurate evidence.  As a result, Plaintiff

contends that the hearing was rendered fundamentally unfair to her.  Not surprisingly, Defendant

disagrees and asks the Court to confirm the award.

The Hotel's position carries the day, as the Court concludes that the Arbitrator's

discovery-related decisions did not amount to misconduct such that White was denied a

fundamentally fair hearing.  Because she cannot meet the very demanding standard for vacatur,

the Court will deny her Motion to Vacate the Arbitration Award and grant Defendant's Motion

to Confirm the Award.

## I.      Background

Lisa White is a black woman who worked as an esthetician in the spa at the Four Seasons

Hotel here in Washington from September 2007 to August 2012.  See ECF No. 42-1, Exh. K

(Award) at 2.  Initially hired for part-time work, she became a full-time employee in July 2008.

Id.  In August 2012, she filed a charge of discrimination against Four Seasons with the Equal

Employment Opportunity Commission and the D.C. Office of Human Rights.  Id. at 3; Pl. Mot.

at 4.  White alleged that the Hotel had discriminated against her on the basis of race and

pregnancy by depriving her of client bookings and opportunities for promotion, subjecting her to

a hostile work environment, and retaliating against her for voicing her concerns.  See Award at 1;

Pl. Mot. at 3.  She accordingly asserted violations of Title VII of the Civil Rights Act of 1964, 42

U.S.C. § 2000e, et seq., Section 1977 of the Civil Rights Act of 1866, 42 U.S.C. § 1981, and the

D.C. Human Rights Act of 1977, D.C. Code § 2-14.  See Award at 1.

After the EEOC issued White a Notice of Right to Sue, she brought this action in the

Superior Court for the District of Columbia in August 2013.  See ECF No. 1-1.  Four Seasons

then removed the case to federal court and moved to compel arbitration.  See ECF Nos. 1, 5.

This Court granted the motion in November 2013 and stayed the case pending arbitration, which

lasted for almost three years.  White v. Four Seasons Hotels & Resorts, 999 F. Supp. 2d 250

(D.D.C. 2013).

As provided for in White's employment contract, Four Seasons began the process by

filing a request for arbitration with the American Arbitration Association.  See Def. Mot. at 2-3.

The parties received names of possible arbitrators and selected Patricia Horan Latham, an

individual with more than 30 years of experience as an arbitrator/mediator and more than 40

years of experience as an attorney.  Id.; ECF No. 43-1 (Résumé of Patricia Horan Latham) at 1.

After selecting the Arbitrator, the parties engaged in written discovery, document production, and the taking of depositions. This was no simple task. In fact, they produced 10,912 pages of documents, Four Seasons responded to 67 Interrogatories and took two depositions, and White took eleven depositions. See Def. Mot. at 3. Among those individuals deposed were: Brian Simon, White's manager at the Spa; Julia Boeminghaus, who succeeded White as Spa manager; Laura Hatala, a white esthetician at the Spa; Christian Clerc, President of Hotel Operations for Europe, the Middle East, and Africa; Carolina Baldi, Spa Supervisor; Stacey Coppel, Human Resources Director; Craig Statham, Regional Director of Information Technology; and Ella Stimpson, the Spa's expert witness on spa operations. See ECF No. 42-1, Exhs. A, B, D, F, L, P, W, KK.

The arbitration hearing took place over the course of eleven non-consecutive days, beginning on February 29 and ending on August 18, 2016. See ECF No. 42-1, Exh. AA (Tr. Arbitration Hearing, Day 1, Feb. 29, 2016); id., Exh. II (Tr. Arbitration Hearing, Aug. 18, 2016). "Eleven witnesses testified during the hearing, resulting in a record consisting of 3,035 pages of testimony and 1,166 pages of exhibits." Def. Mot. at 1. The parties then submitted post-hearing briefs. See ECF No. 42-1, Exhs. C, GG. On October 19, 2016, the Arbitrator issued an award in favor of Defendant. See Award. After discussing some of White's claims — including that she was unfairly denied appointments and promotion opportunities, harassed by her co-workers and supervisors, and subjected to surveillance because of her complaints — and finding them to be without sufficient support, the Arbitrator concluded that Four Seasons had not engaged in discrimination and denied all of her claims. Id. at 3-9.

Plaintiff then timely filed the instant Motion, seeking to vacate the award on the ground that the Arbitrator "refus[ed] to hear evidence pertinent and material to the controversy." 9

U.S.C. § 10(a)(3).  This purported misconduct relates only to her disparate-treatment claim; she asserts no arguments as to the remainder of her unsuccessful counts.  Defendant, in turn, filed an Opposition and Cross-Motion to Confirm the Award.  Those Motions are now ripe.

## II.      Legal Standard

In enacting the Federal Arbitration Act, 9 U.S.C. § 1 *et seq.*, Congress "replace[d] judicial indisposition to arbitration with a 'national policy favoring [it] and plac[ing] arbitration agreements on equal footing with all other contracts." Hall St. Assocs., L.L.C. v. Mattel, Inc., 552 U.S. 576, 578 (2008).  The FAA "establish[es] an alternative to the complications of litigation," Revere Copper & Brass Inc. v. Overseas Private Inv. Corp., 628 F.2d 81, 83 (D.C. Cir. 1980), and provides for "expedited judicial review to confirm, vacate, or modify arbitration awards." Hall St. Assocs., 552 U.S. at 578.

As the D.C. Circuit has repeatedly emphasized, "[J]udicial review of arbitral awards is extremely limited." Kanuth v. Prescott, Ball & Turben, Inc., 949 F.2d 1175, 1178 (D.C. Cir. 1991).  "Courts thus do not sit to hear claims of factual or legal error by an arbitrator as an appellate court does in reviewing decisions of lower courts." Id. (quoting United Paperworkers Int'l Union v. Misco, Inc., 484 U.S. 29, 38 (1987)); see also Kurke v. Oscar Gruss & Son, Inc., 454 F.3d 350, 354 (D.C. Cir. 2006).  Consequently, a party seeking to challenge an arbitrator's award under any of the FAA's four limited grounds, see 9 U.S.C. § 10(a), "must clear a high hurdle." Stolt-Nielsen S.A. v. AnimalFeeds Int'l Corp., 559 U.S. 662, 671 (2010).  Even a serious legal or factual error on the part of the arbitrator will not, standing alone, justify vacatur of an award. Id.

Here, Plaintiff invokes 9 U.S.C. § 10(a)(3), which authorizes vacatur of an award "where the arbitrator[ was] guilty of misconduct . . . in refusing to hear evidence pertinent and material

to the controversy."  "The scope of review under this provision is narrow."  Howard Univ. v.

Metro. Campus Police Officer's Union, 512 F.3d 716, 721 (D.C. Cir. 2008).  This is because, "in

making evidentiary determinations," arbitrators "need not follow all the niceties observed by the

federal courts."  Id. (quoting Lessin v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 481 F.3d

813, 816 (D.C. Cir. 2007)).  In submitting to arbitration, litigants lose, for example, the right to

the extensive discovery afforded by the courts.  See Shearson/Am. Exp., Inc. v. McMahon, 482

U.S. 220, 259 n.18 (1987).  An arbitrator may determine whether or not certain evidence would

prove relevant to her determination.  See Lessin, 481 F.3d at 817.  She thus has substantial

leeway to admit any evidence that she finds useful — even hearsay evidence.  See Barker v.

Gov't Emps. Ins. Co., 339 F. Supp. 1064, 1067 (D.D.C. 1972).  An arbitrator may likewise opt to

expedite a proceeding by excluding evidence and testimony that she finds irrelevant or

duplicative.  See Lessin, 481 F.3d at 817; Fairchild & Co. v. Richmond, Fredericksburg &

Potomac Ry. Co., 516 F. Supp. 1305, 1314-15 (D.D.C. 1981).  In certain circumstances, an

arbitrator may even have the freedom to limit or bypass oral argument altogether.  See, e.g., In re

Arbitration between InterCarbon Bermuda, Lt. & Caltex Trading & Transp. Corp., 146 F.R.D.

64, 72-73 (S.D.N.Y. 1993); Cearfoss Const. Corp. v. Sabre Const. Corp., No. 89-1223, 1989 WL

516375, at *3-4 (D.D.C. Aug. 14, 1989).

It is thus generally not enough for the party seeking vacatur to complain that the

arbitrator made procedural missteps; "[e]very failure of an arbitrator to receive relevant evidence

does not constitute misconduct requiring vacatur of an arbitrator's award."  Lessin, 481 F.3d at

818 (quoting Hoteles Condado Beach, La Concha & Convention Ctr. v. Union De Tronquistas

Local 901, 763 F.2d 34, 40 (1st Cir. 1985)).  Ultimately, all that is required is that the arbitrator

"grant the parties a fundamentally fair hearing."  Id. at 816 (quoting Bell Aerospace Co. Div. of

Textron v. Local 516, 500 F.2d 921, 923 (2d Cir. 1974)). "[A] fundamentally fair hearing requires only notice, opportunity to be heard and to present relevant and material evidence and argument before the decision makers, and that the decision makers are not infected with bias." Howard Univ. v. Metro Campus Police Officer's Union, 519 F. Supp. 2d 27, 39 (D.D.C. 2007), aff'd, 512 F.3d 716 (D.C. Cir. 2008) (quoting Bowles Fin. Grp., Inc. v. Stifel, Nicolaus & Co., Inc., 22 F.3d 1010, 1013 (10th Cir. 1994)).

## III.    Analysis

Before proceeding to the analysis of White's 9 U.S.C. § 10(a)(3) argument, the Court notes that she also obliquely invokes a non-statutory, common-law ground for vacatur: that the Arbitrator manifestly disregarded the law in reaching her final decision. See Pl. Mot. at 20 n.16. She does so only in a footnote, however, and never affirmatively argues that "manifest disregard" is still a proper ground for vacatur in light of recent Supreme Court decisions. Id.; see also ARMA, S.R.O. v. BAE Sys. Overseas, Inc., 961 F. Supp. 2d 245, 268 (D.D.C. 2013) (discussing Supreme Court's equivocation in Hall Street Associates, 552 U.S. at 585, on whether manifest disregard of law can be basis for vacatur of arbitral award). The Court thus considers the issue forfeited. Huntington v. Dep't of Commerce, 2017 WL 211301, at *4 (D.D.C. Jan. 18, 2017); Gold Reserve Inc. v. Bolivarian Republic of Venezuela, 146 F. Supp. 3d 112, 126-27 (D.D.C. 2015) (holding "obliquely" raising issue in footnote insufficient to surmount waiver threshold); see Hutchins v. District of Columbia, 188 F.3d 531, 539 n.3 (D.C. Cir. 1999) (*en banc*) (explaining courts "need not consider cursory arguments made only in a footnote"); Johnson v. Panetta, 953 F. Supp. 2d 244, 250 (D.D.C. 2013) ("[P]erfunctory and underdeveloped arguments, and arguments that are unsupported by pertinent authority, are deemed waived.").

Turning now to White's contention regarding § 10(a)(3), the Court must decide whether, given the extremely narrow standard of review described above, the Arbitrator's actions deprived her of a fundamentally fair hearing.  The heart of Plaintiff's objection to the Arbitrator's conduct centers around rulings relating to records from a database program called SpaSoft, which the Spa used to manage appointment scheduling.  White believes those records are crucial to her disparate-treatment arguments.  See Pl. Mot. at 4-8.

Specifically, White contends that when it came to scheduling her for appointments with clients, Spa management, particularly Brian Simon, routinely violated the Spa's policy that full-time estheticians like White generally were to be given three hours of bookings during a particular shift before a part-time colleague assigned to the same shift would be given her first hour of booking.  See Pl. Mot. at 2 (citing ECF No. 42-1, Exh. B at 36:10-22).  She alleges that she was improperly deprived of up to three bookings per month, to the benefit of her white part-time colleagues, and that her white full-time colleagues experienced no such problems.  Id. at 1-3.  As further evidence that Simon targeted her because of her race, White asserts that he twice deprived her of the opportunity to apply for promotions at the Spa, once by failing to pass along a promotion application to Human Resources, and later by discussing with White a promotion for a position that did not exist.  Id. at 3 (citing ECF No. 42-1, Exh. F at 58:18-59:7, 103:2-22).  Four Seasons, in response, offers several non-discriminatory reasons the 3:1 guideline was not always adhered to, including guest cancellations, last-minute appointment additions, and specific-provider requests.  See Def. Mot. at 6-7.

To substantiate her disparate-treatment claims, White sought various SpaSoft records.  As detailed below, Four Seasons delayed in producing the requested records, and those it ultimately produced were at times incomplete, inaccurate, or not in the format White desired.  Plaintiff now

argues that the Arbitrator knowingly failed to respond to Defendant's "bad-faith spoliation and withholding of key evidence" and, in so doing, "'refus[ed] to hear evidence pertinent and material to the controversy'" such that she "was deprived of a fundamentally fair hearing."  Pl. Reply at 1 (quoting 9 U.S.C. § 10(a)(3)).  The Court first reviews the nature of the discovery dispute and then assesses whether White in fact received less than a fair hearing.

A.  Discovery Dispute

In White's first request for document production during the arbitration's discovery phase, she rather broadly asked for "weekly schedules . . . for every employee, past and present, part-time or full-time," at the Spa "from August 2007 through present."  ECF No. 42-1, Exh. N at 8. Defendant proposed providing PDF screen shots of the Visual Book — the SpaSoft calendar that showed all appointments — for each of the appointments scheduled during White's tenure at the Spa.  See ECF No. 42-1, Exh. R (Letter from Vincent McKnight to Patricia Horan-Latham, Nov. 20, 2015) at 2.  In a letter to the Arbitrator, White objected to the use of screen shots, arguing that they were not the format in which the data was kept in the regular course of business and were "not searchable," could not "be manipulated," and were not able "to be sorted or compared."  Id.  Explaining that her claims "rest[ed] in part on whether or not Four Seasons engaged in discriminatory booking practices by giving preference to white estheticians over Ms. White, as well as crediting white employees with sales attributable to Ms. White," Plaintiff requested the following data:

> [I]n digital format, for the period of her tenure: all esthetician appointments scheduled; the date and time the appointments were scheduled; the name of the person who scheduled the appointment; whether Lisa White was available when appointments were scheduled; all appointment cancellations or modifications, as well as the time and date of the cancellation or modification; a record of whether a client requested a specific esthetician; for each appointment scheduled, a record of the esthetician's seniority;

> profits associated with each booking; comparative data showing income produced between estheticians; payment to esthetician associated with each booking; any data showing the implementation of preferences for full-time estheticians over time, and; any data showing the frequency of supervisor review and modification of the schedule.

Id. (footnote omitted).

Four Seasons protested that "the SpaSoft data" had "no probative value whatsoever." ECF No. 43-5 (Letter from Paul Wagner to Patricia Horna-Latham, Jan. 19, 2016) at 2.  It explained: "[M]ultiple factors continually affected the bookings," "numerous people in different departments were involved in making the appointments," and "the 3-1 ratio . . . was merely a booking guideline, not a guarantee of compensation or a promise that the total number of appointments would ultimately fall within that ratio."  Id.  Consequently, the Hotel reasoned, the data could not prove that White was denied bookings "due to her race or for any other reason, because the variables that determined how bookings were made or changed on any given day cannot be recreated . . . with any certainty," and, in any case, "White's earnings were approximately the same for each full year that she worked at the spa," if one accounted for medical leave.  Id.  Defendant further argued that the information requested was burdensome to produce digitally and explained that it had "already created PDF files with documentary records of the schedules on days that Lisa White worked."  Id. at 1.

Reaching a compromise solution, the Arbitrator ordered the Hotel to produce the data "in digitally indexed form" for four sample months that she — not the parties — had randomly selected.  See ECF No. 42-1, Exh. T (Arbitrator's Order, Jan. 26, 2016) at 1.  She also stated that if additional production was needed during the course of the hearing, she would order it and schedule additional hearing days.  Id.

In February 2016, Defendant produced Excel-formatted Visual Book records for the four

sample months.  See Pl. Mot. at 6.  Those Excel records and the previously produced PDF screen

shots of SpaSoft records during White's employment at the Spa, however, were not complete.

Among other omissions and inconsistencies, they did not include the appointments of Joanne

Fleming, a white, part-time esthetician whom White had indicated she was likely to invoke as a

comparator.  See Pl. Mot. at 6-7; ECF No. 42-1, Exh. Q (Declaration of Vincent McKnight, Feb.

23, 2016), ¶¶ 30-33.  To compensate for the missing data, Four Seasons produced appointment

logs for January 2008 to May 2010 — the period during which Fleming worked part time and

White worked full time — that contained all estheticians' appointment records.  See ECF No.

43-9 (Letter from Paul Wagner to Patricia Horan-Latham, Feb. 11, 2016) at 1.

White subsequently moved for the Arbitrator to draw an adverse inference against Four

Seasons.  See ECF No. 42-1, Exh. O.  She recounted her allegations of discrimination, id. at 3-5,

and argued that Defendant had a duty to preserve pertinent documents since December 2009 but

had nonetheless "lost or destroyed relevant evidence" — i.e., the SpaSoft records.  Id. at 11-14.

She explained that comparator evidence is often considered important in discrimination cases

and contended that the deficiencies in the data produced rendered her unable to determine the

number of times Fleming had received a scheduling preference over her.  Id. at 8-10, 14-15.  In

response, Defendant argued, *inter alia*, that although Fleming's data was missing from the Visual

Book PDF and Excel productions, it was available in the appointment logs.  See ECF No. 42-1,

Exh. X at 1, 10.  The Hotel also rebutted the notion that it had deliberately destroyed Fleming's

SpaSoft records.  Craig Statham, Regional Director of Information Technology for the Hotel,

explained that Fleming's information "most likely . . . was deleted shortly after the termination

of her employment, as it is customary to delete other accounts when employees leave, such as

email accounts." ECF No. 42-1, Exh. Z, ¶ 3.  The Arbitrator denied White's motion.  See ECF

No. 42-1, Exh. AA (Tr. Arbitration Hearing, Day 1, Feb. 29, 2016) at 11:5-9.

After the arbitration hearing commenced, White deposed two Rule 30(b)(6) witnesses

designated by Four Seasons to testify about the Hotel's use of SpaSoft between 2004 and 2015:

Statham and the Spa's Director, Julia Boeminghaus.  See Def. Mot. at 19.  Days later, White

moved for default judgment, arguing that "the full extent of [Defendant's] misconduct came into

focus" at the depositions.  See ECF No. 42-1, Exh. V (Letter Motion for Default Judgment, June

18, 2016) at 1.  In the motion, White identified what she believed to be two misrepresentations:

First, although Statham had previously stated that Fleming's information likely was deleted upon

her termination, Boeminghaus testified that she had seen in Visual Book the appointment logs of

previous employees and that there was no protocol to delete providers from the system after they

left and she had never heard of anyone doing so.  Id. at 304.  Both she and Statham — despite his

previous comments — testified that had a provider been deleted from SpaSoft, it would have

prevented them from being assigned bookings moving forward but left their historical data intact.

Id. at 4-5.  From these statements, White surmised that Four Seasons may have "falsified or

manipulated, perhaps inadvertently," the Visual Book records it produced.  Id. at 11.  Second,

Statham testified that Four Seasons sent a full backup of its SpaSoft data to an off-site storage

location every month between 2006 and 2015.  Id. at 5.  White thus concluded that, although the

archive on which Defendant relied to produce the four sample months' data may have been

corrupted, it easily could have accessed another non-corrupted backup that included Fleming's

data.  Id.

The Arbitrator denied the motion for default judgment on June 20, 2016.  See ECF No.

45 (Tr. Arbitration Hearing, Day 6, June 20, 2016) at 7:2-8.  The parties then engaged in an

extended discussion with the Arbitrator about whether Defendant should be ordered to obtain

backup tapes that might include Fleming's information.  Id. at 7:16-20:22.  The Hotel had not

done so, it explained, because of the associated costs.  Id. at 12:19-16:5.  White's counsel

eventually agreed to pay for three months of backup tapes, id. at 21:1-4, at a cost of $1,500 per

tape.  Id. at 15:19-20.

Two and a half weeks later, White asked the Arbitrator to compel production of

"complete SpaSoft visual book records (1) for all dates on which [White] worked in

[Defendant's] spa, (2) in Microsoft Excel format, and (3) with all metadata existing at the time of

retrieval intact."  ECF No. 42-1, Exh. EE (Letter from Vincent McKnight to Patricia Horan-

Latham, July 8, 2016) at 1.  The motion recapped the Hotel's history of incomplete and

inaccurate data production, argued that its "refusal to provide complete visual book data in a

usable format violates [Federal Rule of Civil Procedure] 34," and maintained that the PDF screen

shots previously produced were too degraded to be usable.  Id. at 2-4.

Four days after that, Defendant emailed Plaintiff the backup file for which she had paid

— i.e., Excel-formatted Visual Book data for May 2009, October 2009, and April 2010.  See

ECF No. 42-1, Exh. FF (Email from Paul Wagner to Vincent McKnight, et al., July 12, 2016).  It

then responded to White's motion to compel, arguing that it had produced four sample months of

data as required by the Arbitrator, as well as screen shots, appointment logs, and the backup

tapes White paid for, and that none of those thousands of pages revealed evidence of

discrimination.  See ECF No. 43-18 (Letter from Paul Wagner to Patricia Horan-Latham, July

13, 2016) at 2-3.  Four Seasons asked the Arbitrator to "enter[] an order prohibiting further such

motions and/or awarding [Defendant] its fees and costs for responding to them."  Id. at 4

(emphasis omitted).  The Arbitrator denied White's motion to compel, but did not expressly

prohibit further motions or award Four Seasons fees.  See ECF No. 43-20 (Arbitrator's Ruling,

July 13, 2016) at 1-2.  In so ruling, she recapped the documents that Four Seasons had produced

and noted that numerous witnesses had testified about SpaSoft and the appointment-scheduling

process.  Id. at 2.

The next month, the Arbitrator held the final day of the hearing.  See ECF No. 42-1, Exh.

II (Tr. Arbitration Hearing, Day 11, Aug. 18, 2016).  At the outset, she made decisions regarding

exhibits newly presented for admission.  She admitted three Visual Book exhibits — the backup

data most recently supplied to Plaintiff — but declined to admit several appointment-log exhibits

because Plaintiff had delayed in introducing them for several months absent any good reason and

witnesses would not have had an opportunity to testify regarding them.  Id. at 5:3-12:11.

The Arbitrator ultimately issued her decision in favor of Defendant in October 2016.  See

Award.  She therein addressed White's specific claims, including, as relevant here, the alleged

booking-policy violations.  Id. at 3-5.  After summarizing the 3:1 guideline and its exceptions,

she observed that "[t]he appointments system was not perfect but overall was operated in a

reasonable manner."  Id. at 4.  White, she noted, "received sufficient assignments" to move from

a part-time to full-time position in 2008 and "to remain full-time and to earn substantial income"

until 2012, and "was the top wage earner . . . in esthetics" while full time.  Id. (citation omitted).

At the end of the day, the Arbitrator concluded, "There is not support for a finding that either the

software or the adjustments made by management were intended to discriminate against [White]

on the basis of race or had a disparate impact based upon race."  Id. at 5.

B.  Fundamentally Fair Hearing

In moving to vacate the arbitral award, White argues that the Arbitrator's discovery-

related decisions described above constituted misconduct as defined in the Federal Arbitration

Act.  Specifically, she asserts that, by "fail[ing] to address [Defendant's] production of clearly

incomplete and inaccurate records" and "[p]ermitting such misconduct — amounting to

spoliation of evidence — to go unchecked," the Arbitrator "failed to sustain an arbitral forum

wherein evidence could be properly exchanged and examined," "refused to hear the evidence

that was never produced," and "deprived [White] of a hearing that even approached fundamental

fairness."  Pl. Mot. at 19.  She further explains in her Reply that, because "a party's spoliation or

withholding of evidence prevents the opposing party from presenting any arguments concerning

the pertinence and materiality of the evidence, and prevents the arbitrator from considering any

aspect of the evidence," the FAA's evidentiary-misconduct test is satisfied when an arbitrator

permits such action to continue unchecked.  See Pl. Reply at 1 (citing 9 U.S.C. § 10(a)(3)).

The Court does not concur, as it believes that White has not cleared the high threshold of

showing fundamental unfairness.  On the contrary, the record reveals that she was able, on

several occasions, to present detailed arguments about the pertinence and materiality of the

booking records, and that the Arbitrator considered aspects of that evidence in reaching her final

decision.  Although Plaintiff may disagree with the outcome, the Court cannot find that it

resulted from any vacatur-worthy deficiency in the proceedings.

To begin, the Arbitrator entertained several motions from White in which she articulated

her position concerning the relevance and significance of the appointments evidence.  See, e.g.,

ECF No. 42-1, Exh. O (Pl. Mot. for Adverse Inference) at 6 ("With a racist comparator and a

manager who had workplace issues with only minorities, discovery in this matter is essential to

prove the priority booking rule was misapplied in a discriminatory fashion."); id. at 8 ("[T]he

number of times that Ms. Fleming, a part-time worker, received a scheduling preference over the

full-time Ms. White . . . is relevant to both liability and damages."); id. at 14-15 (explaining how

"[t]he lost or destroyed SpaSoft records were clearly relevant to Ms. White's claim"); id., Exh. V

(Pl. Mot. for Default Judgment) at 8-9 (arguing Defendant's failure to produce the requested

SpaSoft records "severely hampered [White's] ability to present her case").  In those same

motions, White argued vigorously that the Hotel had engaged in bad-faith spoliation of evidence.

See Pl. Mot. for Adverse Inference at 11-14; Pl. Mot. for Default Judgment at 2; Pl. Mot. to

Compel at 2-4.  By considering and deciding White's discovery-related motions, the Arbitrator

exercised her "full authority to determine whether or not certain evidence would prove relevant

to [her] determination."  ARMA, 961 F. Supp. 2d at 264.  Again, "district courts are not

empowered to second-guess such decisions — procedural or substantive — even if there is

evidence that the arbitrator erred."  Id.

More importantly, White was able to use the booking-policy evidence she obtained — the

Excel-formatted data from the four sample months (including the backups), the PDF screen

shots, some of the appointment logs, and the many depositions — to fully expand upon the

merits of her discrimination claim at the lengthy hearing.  During closing arguments, for

example, White's counsel, relying on a "review[ of] all of the visual books," told the Arbitrator,

"Brian Simon violated the three to one policy with respect to Ms. White on 37 occasions."  ECF

No. 42-1, Exh. II (Tr. Arbitration Hearing, Aug. 18, 2016) at 97:24-98:8.  After a Human

Resources Director began investigating White's complaints against Simon, counsel stated, the

violations decreased from a rate of "1.6 to two violations" per month to "point six per month."

Id. at 100:13-23.  Based on that data, counsel argued, "[T]he only way we can explain that spike

[in violations] in the 23 months that Brian Simon was supervising Ms. White before the

intervention of [Human Resources] is that there was an intentional conduct."  Id. at 102:10-14.

15

White likewise marshaled booking-policy evidence to make similar arguments in her post-hearing submissions.  According to Plaintiff's briefing, she "presented extensive data of (1) specific incidents when [she] was inappropriately deprived of appointments to which she was entitled under the Policy, . . . and (2) data showing rates of misbooking over time."  Pl. Mot. at 14 (citing ECF No. 42-1, Exh. M. (Appendix of 3:1 Policy Violations) at 1-2).  Indeed, White devoted six pages to documenting booking-policy violations and six more to arguing that those violations constituted disparate treatment.  See ECF No. 42-1, Exh. C (Post-Hearing Mem.) at 7-12, 30-35.  Notably, she explained that she notified Simon of more than 100 policy violations in less than two years, whereas her white predecessor had raised booking issues only once per month, all of which were resolved.  Id. at 7, 33 & n.142.  She appended SpaSoft records that she alleged showed at least 58 violations during the period she worked full time under Simon and contended that, based on shifts when White worked full time and Hatala, a white esthetician, worked part time, policy violations occurred 22% of the time.  Id. at 8; Exh. M at 1.  White also argued, again based on appended evidence, that the Spa could have enforced the 3:1 booking policy had it wanted to, given that the rate of policy violations per shift dropped from 22% to 12% after she complained to the Hotel's Human Resources Director and to 10% after Simon was forced to resign.  See Post-Hearing Mem. at 10-11, 33; see also Exh. M at 2; Exh. H (Letter to Brian Simon, May 10, 2010).

In addition to relying on the various SpaSoft records to make her disparate-treatment argument, White utilized testimony from several of the individuals deposed during the discovery period.  Although she could not rely on the appointment logs to compare her bookings with Fleming's — as the Arbitrator held she had unduly delayed introducing them — she made a comparator argument another way.  In particular, she referenced Hatala's deposition to contend

that, whereas Hatala had not experienced many violations when she worked full time at the Spa, "numerous policy violations persisted" when White worked full time under Simon, including when Hatala had received appointments that should have gone to White.  See Post-Hearing Mem. at 7 n.38, 8 & n.44.  She also cited the deposition of the Hotel's Regional Human Resources Director — Stacey Coppel — and asserted that Coppel had admitted that White suffered numerous violations.  Id. at 8 & n.43.

In the final analysis, then, although White may be frustrated by the delays in production and the omissions in some versions of the SpaSoft records, the Arbitrator oversaw a thorough and extended discovery process and an eleven-day hearing during which White received and was able to introduce into the record significant evidence — including scheduling data and witness testimony — related to the alleged booking-policy violations.  Armed with that evidence, White was able to present the Arbitrator with a well-developed, if ultimately unconvincing, argument that she had been denied client appointments on the basis of her race.  Plaintiff may have wanted more or differently formatted documents, but the Court may vacate the award only if it can conclude that the Arbitrator was guilty of misconduct in presiding over the proceeding.  On this record, it simply cannot do so.  White had a full opportunity to be heard and to present relevant and material evidence and argument, and she offers no basis on which the Court could conclude that the Arbitrator was biased against her.  See Howard Univ., 519 F. Supp. 2d at 39.  The Arbitrator's decisions not to compel further production, draw an adverse inference, or order default judgment thus did not deprive White of a fundamentally fair hearing.

**IV.     Conclusion**

For the foregoing reasons, the Court will deny Plaintiff's Motion to Vacate the

Arbitration Award and grant Defendant's Motion to Confirm the Arbitration Award.  A

contemporaneous Order so stating will issue this day.

/s/ *James E. Boasberg*
JAMES E. BOASBERG
United States District Judge

Date:  March 23, 2017